Affirmed in part, reversed in part, and remanded by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Judge KING concurred. Judge NIEMEYER wrote an opinion concurring in part and dissenting in part.
OPINION
DIANA GRIBBON MOTZ, Circuit Judge:
This appeal presents the question of whether the district court abused its discretion in conditionally certifying a class action in a suit brought by purchasers and beneficiaries of a multi-employer health care plan for claims growing out of the plan’s collapse. The district court conditionally granted class certification against the plan’s claims administrator, Healthplan Services Inc., as successor in interest to Third Party Claims Management, Inc. (collectively, “TPCM”) and against individual and corporate insurance agents who marketed and sold the plan. The court properly applied controlling legal principles and made well-supported factual findings supporting its decision to certify a class action against TPCM; thus, we see no abuse of discretion in that decision. However, because the court rested its class certification against the individual agents on findings grounded in a misapprehension of governing law, we must conclude that the court did abuse its discretion in certifying those separate class actions. Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
*422 I.
Since this is an interlocutory appeal, filed even before the parties have completed discovery, the facts surrounding the claims of the purchasers and beneficiaries (collectively, “Plaintiffs”) have not been fully developed. Thus, the record to date reveals only the following rough outline of the events leading up to the present lawsuit.
Sometime in 1995, Fidelity Group, Inc., the National Association of Business Owners and Professionals (“NABOP”), and the International Workers Guild, Inc. (“IWG”), created the IWG Health and Welfare Fund (the “Fund”), which in turn offered a health care and dental plan (the “Plan”) to interested purchasers. From August 1996 until June 1997, when the South Carolina Department of Insurance ordered marketing to cease, the agents marketed and sold the Plan. Although it was purportedly marketed as an ERISA plan, the Plan never complied with ERISA requirements.
In April 1995, Fidelity hired TPCM to process claims under the Plan as a third party administrator. TPCM failed to keep pace with the claims received, creating a huge backlog of unprocessed claims. In May 1997, Fidelity fired TPCM for incompetence and attempted to transfer the claims management process to an in-house operation. Assertedly, difficulties in obtaining data from TPCM and the massive backlog it had created ultimately led to the Plan’s collapse.
Approximately 1400 employees and their families contracted for coverage under the Plan. As many as 2900 claims have gone unpaid, amounting to millions of dollars in unpaid medical bills.
In August 1998, Plaintiffs sued Fidelity Group, NABOP, IWG, and the Fund (collectively, “the Fidelity Defendants”) in state court in South Carolina. The defendants removed the case to federal court. Later in the year, Plaintiffs amended their complaint to add TPCM and the agents as defendants. In that complaint, Plaintiffs allege that one or more of the defendants engaged in negligent undertaking, fraud, negligent misrepresentation, breach of contract, civil conspiracy, and violated the South Carolina Unfair Trade Practices Act, S.C.Code Ann. § 39-5-140 (1985), and Title IX of the Organized Crime Control Act of 1970, 18 U.S.C.A. §§ 1961-68 (West 2000 & Supp.2000) (“RICO”).[1] In short, Plaintiffs assert that the agents breached contractual and fiduciary duties owed to the Plaintiffs and misrepresented the Plan’s attributes through then." marketing efforts, which caused Plaintiffs to purchase the woefully deficient Plan. As to TPCM, Plaintiffs allege that it mismanaged administration of the Plan, created a huge backlog of unpaid claims, did not timely transfer information, and made it impossible to forecast rate increases accurately, resulting in the Plan’s collapse and failure to pay hundreds, if not thousands, of health care claims. In their prayer for relief, Plaintiffs
seek recovery for all legally allowable damages including refunds of premiums paid, payment of outstanding medical/dental bills, reimbursement for medi *423 cal bills paid by Plaintiffs where treatment occurred while Plaintiff [s were] covered by the Plan, compensation for injury to credit, compensation for injury to ability to obtain credit, time spent and costs incurred attending to the difficulties resulting from the failure of the Plan, loss of enjoyment of life attendant to the stress caused by the failure of the Plan.
Plaintiffs also seek punitive damages.
After some initial discovery, Plaintiffs moved for certification of a class, pursuant to Federal Rule of Civil Procedure 23(b)(3), of “all entities and people who purchased the Fidelity Plan or who were provided with coverage under the Fidelity Plan in South Carolina at any time.” In addition, with respect to certain “agent-specific” claims, Plaintiffs moved for certification of subclasses consisting of “all entities and persons who purchased the Fidelity Plan from or were provided the Fidelity Plan by that particular agent in South Carolina.”
After refusing to certify any claims under the South Carolina Unfair Trade Practices Act, see S.C.Code Ann. § 39-5-140(a) (West 1985) (a person “may bring an action individually, but not in a representative capacity, to recover actual damages”), the district court granted Plaintiffs’ class certification motion in large part. Gunnells v. Fidelity Group, Inc., No. 2:98-2639-23 (D.S.C. Sept. 28, 2001) (located at J.A. 1244-1271). The court conditionally granted Plaintiffs’ motion for class certification with respect to their mismanagement claim against TPCM. Moreover, although the court declined to certify Plaintiffs’ civil conspiracy and RICO claims against the agents, it did certify subclasses to permit Plaintiffs to pursue their four theories of liability— negligent undertaking, fraud, negligent misrepresentation, and breach of contract — via separate class actions against each of the twenty-three agents that as-sertedly sold insurance to a named class representative, withholding “ruling on the certification of the agent classes for which there [wa]s currently no representative.” J.A. 1265 n.21.
Pursuant to Federal Rule of Civil Procedure 23(f), both TPCM and a number of agents[2] (collectively, “the Agents”) petitioned for permission to file an interlocutory appeal, which we granted.
II.
Class actions must meet several criteria. First, the class must comply with the four prerequisites established in Rule 23(a): (1) numerosity of parties; (2) commonality of factual and legal issues; (3) typicality of claims and defenses of class representatives; and (4) adequacy of representation. Fed.R.Civ.P. 23(a). Second, the class action must fall within one of the three categories enumerated in Rule 23(b); here Plaintiffs seek to proceed under Rule 23(b)(3), which requires that common issues predominate over individual ones and that a class action be superior to other available methods of adjudication. Fed. R.Civ.P. 23(b)(3).
*424 If a lawsuit meets these requirements, certification as a class action serves important public purposes. In addition to promoting judicial economy and efficiency, class actions also “afford aggrieved persons a remedy if it is not economically feasible to obtain relief through the traditional framework of multiple individual damage actions.” 5 James Wm. Moore et al., Moore’s Federal Practice § 23.02 (3d ed.1999). Thus, federal courts should “give Rule 23 a liberal rather than a restrictive construction, adopting a standard of flexibility in application which will in the particular case ‘best serve the ends of justice for the affected parties and ... promote judicial efficiency.’ ” In re A.H. Robins, 880 F.2d 709, 740 (4th Cir.1989).
To be sure, Rule 23(b)(3) class actions must meet predominance and superiority requirements not imposed on other kinds of class actions. This is because these suits involve situations where “classaction treatment is not as clearly called for.” Fed.R.Civ.P. 23 advisory committee’s note (1966 Amendment, subdivision (b)(3)). However, as the Supreme Court has noted, the predominance and superiority requirements in Rule 23(b)(3) do not foreclose the possibility of mass tort class actions, but merely ensure that class certification in such cases “achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.” Amchem, 521 U.S. at 615, 117 S.Ct. 2231 (quoting Adv. Comm. Notes, 28 U.S.C.App. at 697). For these very reasons, we have expressly “embraced the view that the mass tort action for damages may be appropriate for class action, either partially or in whole.” Central Wesleyan Coll. v. W.R. Grace & Co., 6 F.3d 177, 185 (4th Cir.1992) (citation, internal quotation marks, ellipses, and alterations omitted).
Furthermore, “[district courts have wide discretion in deciding whether or not to certify a class and their decisions may be reversed only for abuse of discretion,” id. (internal quotation marks omitted), recognizing, of course, that this “discretion must be exercised within the framework of Rule 23.” Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 146 (4th Cir.2001) (quoting In re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir.1996)). Our review is particularly deferential in a case like this — involving an interlocutory appeal of a conditional class certification. See Central Wesleyan, 6 F.3d at 186 (noting that “[t]he tentative, limited nature of the conditional certification ... counsels in favor of affirmance.”).[3]
With these principles in mind, we turn to the case at hand. Plaintiffs’ claims against TPCM and the Agents rest on different bases. Accordingly, like the district court, we consider class certification with respect to TPCM and the Agents separately.
III.
The district court conditionally certified the plaintiff class against TPCM allowing *425 the class to pursue a single claim: “that TPCM violated its duties, both contractual and at law, as third party administrator of the Plan and such conduct was a cause of the Fidelity Plan’s failure,” and that “failure directly injured Plaintiffs and the absent class members.” J.A. 1249.
A.
We note at the outset both that the certification order concerning TPCM is strikingly similar to the certification order we upheld in Central Wesleyan and that the district court carefully followed the framework approved in Central Wesleyan, 6 F.3d at 183-186. Here, as in Central Wesleyan, “the district court conducted a straightforward analysis of the class certification requirements under Fed.R.Civ.P. 23(a) and 23(b)(3),” determined that each requirement had been met, and “supported each of its 23(a) and 23(b)(3) holdings with detailed findings.” Id. at 183, 186.
First, the district court found that the “1400 employees plus their families” covered by the Plan, with possibly 2900 unpaid claims, “easily” satisfied Rule 23(a)(1)’s numerosity requirement. J.A. 1248. Cf. Central Wesleyan, 6 F.3d at 183 (noting district court’s finding “that some 480 potential class members would easily satisfy the numerosity requirement”). The court found Rule 23(a)(2) commonality and Rule 23(a)(3) typicality because of the many “factual and legal issues pertaining to TPCM’s conduct ... common” to “all Plaintiffs and class members,” such as: “(1) facts surrounding how TPCM managed its operations; (2) whether it created a backlog of claims; ([3]) whether it failed to enter claims into its system; ([4]) whether it breached its contractual duties; [and (5) ] whether TPCM’s alleged negligence proximately caused Plaintiffs’ injuries by contributing to the failure of the Plan.” J.A. 1254-55. The district court recognized that some of the Plaintiffs’ damages claims might require “individual inquiry” but found that, if necessary, those issues could be bifurcated for individual trials as they were in Central Wesleyan, 6 F.3d at 188-90. See J.A. 1254. With regard to Rule 23(a)(4) adequacy, the court recognized that “class representatives” must “be part of the same class and possess the same interest and suffer the same injury as the class members” and found that in this case the named plaintiffs satisfied these requirements, noting particularly that no “potential conflict existed” among class members. Id. at 1257; cf. Broussard v. Meineke, 155 F.3d 331, 337-38 (4th Cir.1998) (holding “manifest conflicts of interest” among members of class precludes class certification).
As in Central Wesleyan, 6 F.3d at 183-84, the district court next turned to the Rule 23(b)(3) requirement that “questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action [be] superior to other available methods to the fair and efficient adjudication of the controversy,” and “specifically addressed the four matters the Rule lists as pertinent to these findings.” First, the court found that the class members had evidenced “no great deal of interest ... in individual litigation,” noting as support for this finding that although “1400 potential litigants exist,” there was a “dearth of individual cases filed until now.” J.A. 1260. Second, the court held that in view of the few preexisting cases, a class action would be productive. Id. at 1261. Third, the court concluded that “the flexibility and control of this action in one forum [the federal district court in South Carolina] provides the benefits which outweigh the method of individual litigation.” Id. at 1260.
*426 Finally, and again as in Central Wesleyan, 6 F.3d at 184, the district court acknowledged “particular concern” with the fourth factor: “the difficulties likely to be encountered in the management of a class action.” Fed.R.Civ.P. 23(b)(3)(D). The court found that bifurcation of a few issues (e.g., some damages issues) requiring individualized determination would assist it in managing the class action, but recognized that, even so, “given the number of possible class members in this action ... manageability could quickly dissipate.” J.A. 1260. Accordingly, the district court resolved only to grant conditional certification of the class and explained that it would not hesitate to decertify the class if it should prove unmanageable. Id. at 1260-61. (We note that in Central Wesleyan, 6 F.3d at 188-89, we upheld a district court’s conditional certification order in the face of far more formidable management concerns, ie., not only the possible need for individualized damage determinations, but also a “daunting number of individual issues” necessary to “establish liability,” including determination of “comparative fault” among numerous defendants, “[different time bar defenses” with respect to differently positioned defendants, and the necessity of application of the laws of different jurisdictions.)
Thus, here, as in Central Wesleyan, the district court carefully considered the requirements of Rule 23(a) and (b)(3) and made specific and detailed findings as to compliance with those requirements. In doing so, the court followed the admonition in A.H. Robins, 880 F.2d at 740, to “take full advantage of the provision in [Rule 23(c)(4) ] permitting class treatment of separate issues ... to reduce the range of disputed issues” in complex litigation, and most especially the teachings of Central Wesleyan itself, and then exercised its discretion to grant conditional class certification.
As in Central Wesleyan, we must acknowledge that “[s]uch an approach has its promise.” 6 F.3d at 185. First, it appears likely that in the absence of class certification, very few claims would be brought against TPCM, making “the adjudication of [the] matter through a class action ... superior to no adjudication of the matter at all.” See 5 Moore’s Federal Practice § 23.48[1] (1997). Thus, class certification will provide access to the courts for those with claims that would be uneconomical if brought in an individual action. As the Supreme Court put the matter, “[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive, for any individual to bring a solo action prosecuting his or her rights.” Amchem, 521 U.S. at 617, 117 S.Ct. 2231 (citation omitted).
Moreover, as in Central Wesleyan, class certification in this case seems likely to reduce litigation costs through the “consolidation of recurring common issues.” 6 F.3d at 185. Such recurring common issues make up the heart of Plaintiffs’ case against TPCM, ie., whether TPCM mismanaged the Fund, whether TPCM’s mismanagement was a proximate cause of the Plan’s collapse, whether the Fidelity Defendants also mismanaged the Fund, and whether the Fidelity Defendants’ mismanagement was an intervening cause of the Plan’s collapse sufficient to relieve TPCM of liability. Proving these issues in individual trials would require enormous redundancy of effort, including duplicative discovery, testimony by the same witnesses in potentially hundreds of actions, and relitigation of many similar, and even identical, legal issues.
Consolidation of these recurring common issues will also conserve important judicial resources. The record in this case *427 already reveals that a trial on these common issues alone is likely to be lengthy, requiring extensive exploration of the Plan’s collapse and TPCM’s role. The prospect of a long trial, with the possibility of a large damage award may also encourage settlement, which “should be a factor, and an important factor, to be considered when determining certification.” Id. at 186 (quoting A.H. Robins, 880 F.2d at 740).
Furthermore, class certification “provides a single proceeding in which to determine the merits of the plaintiffs’ claims, and therefore protects the defendant from inconsistent adjudications.” 5 Moore’s Federal Practice § 28.02 (1999) (emphasis added). This protection from inconsistent adjudications derives from the fact that the class action is binding on all class members. See Fed.R.Civ.P. 23(c)(2)(B). By contrast, proceeding with individual claims makes the defendant vulnerable to the asymmetry of collateral estoppel: If TPCM lost on a claim to an individual plaintiff, subsequent plaintiffs could use offensive collateral estoppel to prevent TPCM from litigating the issue. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979) (concluding that the use of offensive collateral estoppel should not be precluded in federal courts). A victory by TPCM in an action by an individual plaintiff, however, would have no binding effect on future plaintiffs because the plaintiffs would not have been party to the original suit. See Allen v. McCurry, 449 U.S. 90, 95, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980) (“[T]he concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a ‘full and fair opportunity’ to litigate that issue.”) (citing Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)). Class certification thus promotes consistency of results, giving defendants the benefit of finality and repose.[4]
Indeed, it appears at this juncture that the single claim certified against TPCM— mismanagement of the Plan resulting in its ultimate collapse similarly affecting a large group of people in a single state — seems even better suited for class treatment than the diverse issues against many defendants involving the laws of a number of states that we certified in Central Wesleyan.
B.
Notwithstanding these substantial advantages to class certification, TPCM, like the defendants in Central Wesleyan, “argue[s] that the district court committed multiple errors in conditionally certifying the class.” 6 F.3d at 184. We disagree.
1.
TPCM’s principal argument, which it sounds again and again, is that the probable necessity of individual proof of some of the claimed damages by individual class members prevents Plaintiffs from meeting Rule 23’s requirements. Initially, TPCM contends that individualized damages determinations destroy commonality, typicality, and predominance.[5] But Rule 23 con *428 tains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification. In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations. See Fed.R.Civ.P. 23 advisory committee’s note (1966 Amendment, subdivision (c)(4)) (noting that Rule 23(c)(4) permits courts to certify a class with respect to particular issues and contemplates possible class adjudication of liability issues with “the members of the class ... thereafter ... required to come in individually and prove the amounts of their respective claims.”); see also 5 Moore’s Federal Practice § 23.23[2] (1997) (“[T]he necessity of making an individualized determination of damages for each class member generally does not defeat commonality.”).
Indeed, “[i]n actions for money damages under Rule 23(b)(3), courts usually require individual proof of the amount of damages each member incurred.” Id. at § 23.46[2][a] (1997) (emphasis added). When such individualized inquiries are necessary, if “common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied.” Id.
This is precisely the situation here— “common questions [do] predominate over individual questions as to liability.” Id. Plaintiffs requested, and the district court certified, class claims against TPCM that rest on a single theory: that TPCM’s mismanagement of claims contributed to the ultimate collapse of the Plan and so caused Plaintiffs’ damage. Whether TPCM breached its contract to administer and timely pay claims under the Plan, whether Plaintiffs are third party beneficiaries of that contract, whether TPCM otherwise owed a fiduciary duty of care to Plaintiffs, whether it breached that duty, whether it mismanaged claims at all, and whether its mismanagement contributed to the ultimate collapse of the Plan — are issues common to all potential class members, and do not require any individualized inquiry.
Of these issues, the only one that TPCM even contends is not common to all class members is that of causation. TPCM argues that an individualized inquiry is necessary to determine whether its mismanagement proximately caused Plaintiffs’ injury, arguing that Plaintiffs “provided absolutely no credible evidence that any TPCM action or inaction proximately caused damages to them.” TPCM’s argument fails for several reasons.
First, the sufficiency of the evidence as to proximate cause presented by Plaintiffs goes to the merits of Plaintiffs’ case — an issue the Supreme Court has held courts may not consider in ruling on a motion for class certification. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).
Second, to the extent that TPCM argues that it was not the proximate cause of the Plan’s collapse, the argument actually provides further support for proceeding with this case as a class action. As discussed earlier, class treatment will avert the ne *429 cessity for hundreds of individual trials in which core issues — such as TPCM’s assertion that it was not a proximate cause of the Plan’s collapse — would be relitigated, requiring testimony by the same witnesses, duplicative discovery efforts, etc. If TPCM succeeds in establishing that it was not the proximate cause of the Plan’s collapse, it will enjoy the preclusive effects of this decision against all class members, rather than be disadvantaged by the asymmetric application of collateral estoppel. Compare Fed.R.Civ.P. 23(c)(2)(B) (making class action binding on all members) with Allen v. McCurry, 449 U.S. at 95, 101 S.Ct. 411 (noting that collateral estoppel “cannot apply when the party against whom the earlier decision is asserted did not have a ‘full and fair opportunity’ to litigate that issue” (citations omitted)).
Third, to the extent that TPCM’s causation argument is that individual inquiry is necessary to establish whether the collapse of the Plan caused Plaintiffs any damages, this is precisely the same argument made by almost all defendants in mass tort cases: determining damages will require an individualized inquiry. Courts have routinely rejected this argument, concluding, as we have in previous cases, that the need for individualized proof of damages alone will not defeat class certification. See Central Wesleyan, 6 F.3d at 189; Hill v. W. Elec. Co., Inc., 672 F.2d 381, 387 (4th Cir.1982) (“Bifurcation of ... class action proceedings for hearings on ... damages is now commonplace.”); Chisolm v. Tran-South Fin. Corp., 184 F.R.D. 556, 566 (E.D.Va.1999) (collecting cases). As one court explained, “Quantitatively, almost by definition there will always be more individual damages issues than common liability issues.... Qualitatively, however, ... liability issues” may “far exceed in complexity the more mundane individual damages issues.” In re Honda Motor Co., 979 F.Supp. 365, 367 (D.Md.1997); see also In re Amer. Med. Sys., Inc., 75 F.3d 1069, 1080 (6th Cir.1996) (stating that commonality test is “qualitative rather than quantitative” (citation omitted)). So it is here. The possibility that individualized inquiry into Plaintiffs’ damages claims will be required does not defeat the class action because common issues nevertheless predominate.
Moreover, the damage calculations in this case do not appear to be particularly complex, unlike the calculations in those cases in which courts have found that numerous complicated individual damage inquiries predominated over common issues. Cf. Windham v. Am.Brands, Inc., 565 F.2d 59, 66-67, 72 (4th Cir.1977) (affirming denial of class certification because of overwhelming predominance of thousands of individualized damage questions). In fact, Plaintiffs’ claims for punitive damages do not require any individualized inquiry at all because this damage calculation would be based solely on TPCM’s conduct. In addition, it appears that a court-appointed fiduciary has already calculated most of the Plaintiffs’ claims for medical bills using the same computer program that TPCM and Fidelity used to evaluate claims. Thus, in many cases there is likely to be little or no dispute over the amount to which an individual class member is entitled for unpaid medical claims. Similarly, if the court determines that Plaintiffs are entitled to a refund of premiums paid, these amounts could be quickly and easily determined.
Plaintiffs’ other damages claims — those relating to injury to credit, time lost, and loss of enjoyment of life — may require individualized inquiry. But even considering Plaintiffs’ claims against TPCM as a whole, we cannot conclude that the district court abused its discretion in finding that at this juncture common issues predominate over the individual issues that may be *430 involved in resolving these claims. We note that the district court was fully aware of the possibility that individual issues, although currently subordinate to the common liability and damage issues, might in time predominate and the case prove unmanageable. The court expressly indicated its resolve to deal with this if it became a problem, and for this reason agreed only to certify the class action conditionally. Such care reflects assiduous respect for Rule 23’s requirements, not an abuse of discretion.[6]
2.
TPCM’s remaining arguments have even less merit and require little discussion. Specifically, TPCM argues that the named plaintiffs constitute inadequate class representatives because they purportedly lack sufficient knowledge, and because alleged insurmountable conflicts exist within the class. TPCM also contends that the interest of certain individual class members in pursuing individual litigation defeats any argument that a class action provides a superior vehicle for adjudication of the claims. These arguments also fail.
The lack of knowledge contention is particularly meritless. It is hornbook law, as the district court recognized, that “[i]n a complex lawsuit, such as one in which the defendant’s liability can be established only after a great deal of investigation and discovery by counsel against a background of legal knowledge, the representative need not have extensive knowledge of the facts of the case in order to be an adequate representative.” J.A. 1256 (quoting 32B Am.Jur.2d Federal Courts § 1888 (1996) (footnotes omitted)); see also Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp., 222 F.3d 52, 61 (2d Cir.2000) (“The Supreme Court in Surowitz v. Hilton Hotels Corp., 383 U.S. 363, 370-74, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966) expressly disapproved of attacks on the adequacy of a class representative based on the representative’s ignorance.”).
TPCM’s argument as to insurmountable class conflicts fares no better. According to TPCM, the interests of the employer class members conflict with those of the employee class members because employees may wish to sue their employers for unpaid medical bills resulting from the collapse of the Plan.
To defeat the adequacy requirement of Rule 23, a conflict “must be more than merely speculative or hypothetical.” 5 Moore’s Federal Practice § 23.25[4][b][ii] (2002). In this case, no conflict exists that renders the named representatives inadequate. TPCM has not cited a single case in support of its contention that the employees would have viable claims against their employers for unpaid medical bills caused by the failure of a non-ERISA plan, no employee has filed such a claim, and South Carolina’s three-year statute of limitations now bars such claims. See 7 S.C.Code Ann. § 15-3-530 (West Supp.2002) (applying three-year statute of limitations to actions for, among other things, breach of contract and fraud).
Furthermore, even if an employee could bring such a claim against its employer, this would not require decertification. For a conflict of interest to prevent plaintiffs from meeting the requirement of Rule 23(a), that conflict “must be fundamental. *431 It must go to the heart of the litigation.” 6 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 18:14 (4th ed.2002). Here, the employers and employees share common objectives and the same factual and legal positions. They have the same interest in establishing the liability of TPCM. Thus, any potential conflict does not go to the heart of their roles as class representatives. See Uniondale Beer Co. v. Anheuser-Busch, Inc., 117 F.R.D. 340, 343 (E.D.N.Y.1987) (finding that economic conflict between competitor class members in antitrust action did not render representatives inadequate because all class members sought to prove that defendants conspired to fix prices).[7]
In addition, the dissent suggests a conflict between those Plaintiffs who were not injured by the collapse of the Plan, but have “direct” claims against TPCM for a delay in payment, and those Plaintiffs with “indirect” claims against TPCM that derive from the collapse of the Plan. Post at 461-464. As the Plaintiffs have made abundantly clear on appeal, however, they do not seek class certification for any direct claims against TPCM. See, e.g., Brief of Appellees at 14 (“Contrary to TPCM’s assertions, Plaintiffs do not claim that TPCM improperly adjudicated particular claims. TPCM injured all Plan insureds because it was the cause of the collapse of the Plan.”). To be sure, this position appears somewhat at odds with the Plaintiffs’ original complaint. However, “[t]he federal rules effectively abolish the restrictive theory of the pleadings doctrine,” which held that “a complaint must proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all.” 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1219, at 188-89 (2d ed.1990) (internal quotation marks and citation omitted). Cf. post at 463 (“[W]e should take the complaint as written.”). This observation seems particularly apropos to actions proceeding under Rule 23, which provides that “an action may be brought or maintained as a class action with respect to particular issues.” Fed.R.Civ.P. 23(c)(4)(A) (emphasis added).
Furthermore, even if the Plaintiffs wanted to proceed with direct claims against TPCM, the only claim that the district court certified against TPCM is based on the theory that TPCM caused the collapse of the Plan. See J.A. 1249-50 (“Plaintiffs have alleged that TPCM’s mismanagement of processing claims contributed to the failure of the Fidelity Plan.... Plaintiffs allegations, if proven, will vitiate any need to demonstrate that a particular claim was submitted prior to the expiration of the contract between TPCM and Fidelity.”). Thus, Plaintiffs’ counsel did not so much make “a questionable decision ... to abandon,” a theory of liability on appeal, as the dissent suggests, see post at 463, as accept the scope of the claim that the district court certified for class treatment.
Finally, the dissent errs in suggests ing that the district court’s order “pre *432 dudes recovery for those who were in the circumstance where the collapse of the Plan did not cause injury.” Id. First, the dissent’s argument seems premised on the false assumption that under the district court order the Plaintiffs’ direct claims would be barred by the rule against claim-splitting. But a class action, “of course, is one of the recognized exceptions to the rule against claim-splitting.” 18 Moore’s Federal Practice § 131.40[3][e][iii] (2002) (citing Restatement (Second) of Judgments § 26(1)(c) (1982)). Second, Rule 23(c)(2) permits members of a class maintained under section (b)(3) to opt out of the class, providing an option for those Plaintiffs who wish to pursue claims against TPCM requiring more individualized inquiry. Thus, rhetoric aside, Plaintiffs with only direct claims are not being “[j]amm[ed],” “sacrificed” or “caught” in any class action against their will. Post at 463.[8]
TPCM’s final argument is that class members’ asserted “interest in individual litigation of the claims” and purported possession of “large damage claims” renders their pursuit of individual actions superior to certification of a class action.. This entire argument rests on one fact — that a single named plaintiff, Mary B. Gunnells, claims $70,000 in unpaid medical expenses' — -and one contention — that “at least 17 actions [have been] filed in South Carolina involving the sale and eventual failure of the Fidelity Plan.” The district court carefully considered and acted well within its discretion in rejecting this argument.
The court found that while Ms. Gun-nells claims $70,000 in unpaid medical expenses, “not all of the Plaintiffs’ alleged damages are so high and the damages could run the gamut to much lower figures.” J.A. 1260. Nothing in the record refutes this finding and we can take judicial notice of the fact that many health care claims will involve dollar amounts that are much lower. Moreover, we note that the size of class members’ recovery is hardly determinative of superiority. See 5 Moore’s Federal Practice § 23.48[2][a] (1997) (noting that when “a class action will provide the most fair and efficient adjudication of a case, such an action may be superior even though class members have sufficient means or incentive to proceed individually”). As to the seventeen already-commenced actions, the district court concluded that their existence did not make individual actions superior in a case involving over 1400 potential litigants. Again, nothing in the record in any way contradicts this common-sense finding. TPCM itself notesthat it “has not been named as a Defendant in a single one of those [seventeen] actions,” thus raising questions as to whether the existence of those actions is even relevant to *433 class certification against TPCM. Accordingly, we can hardly conclude that in rendering these findings the district court abused its discretion.[9]
C.
In sum, the district court followed the course we charted in Central Wesleyan. Its careful analysis of Rule 23’s requirements and its detailed factual findings supporting a decision to grant conditional certification against TPCM reveal no abuse of discretion. Of course, we recognize, as the district court did, that this case may ultimately present manageability problems. Nonetheless, we cannot say at this interlocutory stage that the decision to conditionally certify a class action against TPCM constitutes an abuse of discretion, particularly in light of the special deference due trial courts on this issue. See Central Wesleyan, 6 F.3d at 185 (“Issues of class action manageability are properly committed to the district court’s discretion, because that court ‘generally has a greater familiarity and expertise’ with the ‘practical ... and primarily ... factual’ problems of administering a lawsuit ‘than does a court of appeals.’ ” (quoting Windham, 565 F.2d at 65)). If the district court’s current assessment turns out to be inaccurate, and it becomes apparent that individual damage issues will predominate or render the case unmanageable, the court undoubtedly will recognize its responsibility to decertify the class.
We note also that in conditionally certifying the class the court specifically stated that it intended to “heed[] the Fourth Circuit’s warning to keep a watchful vigil in a complicated case such as this one to ‘make certain that manageability and other types of problems do not overwhelm the advantage of conditional certification.’ ” J.A. 1260 (quoting Central Wesleyan, 6 F.3d at 189). Indeed, the court expressly noted that “should such concerns render the class mechanism ineffective, the district court must be prepared to use its considerable discretion to decertify the class.” Id. at 1260-61. We are confident that the court will do precisely this, if necessary.[10]
*434 IV.
The district court also granted, in substantial part, Plaintiffs’ motion for class certification against the individual agents responsible for marketing and selling the Plan. Although the court refused to certify a class as to Plaintiffs’ conspiracy and RICO claims, concluding that individual issues predominated, it did conditionally certify Plaintiffs’ claims based on four other theories of liability: negligent undertaking, fraud, negligent misrepresentation, and breach of contract. The court organized its certification of these claims into subclasses — one for each of the twenty-three agents who had marketed insurance to a named plaintiff. Each subclass was permitted to pursue its four theories of liability via a separate class action.
Once again, we accord the district court’s class certification decision substantial deference. Nevertheless, in this instance, we believe the court abused that discretion. The individual class actions certified against the Agents simply cannot satisfy Rule 23’s predominance and commonality requirements.[11] This is so because Plaintiffs’ claims against the individual Agents require proof of elements not necessary to their single claim against TPCM; and a number of these additional elements can only be established after considerable individual inquiry. Although the district court apparently recognized this as a general matter, it misunderstood or ignored controlling legal principles in holding that in this case such individual determinations would not be necessary and so common issues would predominate. In doing so, “the district court abuse[d] its discretion by ... misapprehending the law-with respect to underlying issues.” See Quince Orchard Valley Citizens Ass’n v. Hodel, 872 F.2d 75, 78 (4th Cir.1989) (internal quotation marks and citations omitted).
A.
The first reason why common issues do not predominate in Plaintiffs’ claims against the Agents is the need for individual inquiry into the issue of rebanee. Indisputably, negligent misrepresentation and fraud require proof of reliance. See Robertson v. First Union Nat’l Bank, 350 S.C. 339, 565 S.E.2d 309, 313-14 (Ct.App.2002) (recounting elements of negligent misrepresentation and fraud claims under South Carolina law). To establish fraud, a plaintiff must prove, inter alia, that the hearer relied on the truth of a fraudulent statement, and had a right to rely thereon. Id. To estabbsh negligent misrepresentation, a plaintiff must prove, inter alia, that the plaintiff “justifiably relied on [a false] representation; and ... the plaintiff suffered a pecuniary loss as the proximate result of his rebanee upon the representation.” Id. at 314. Thus, both theories of babibty require that the plaintiff demonstrate (1) actual reliance and (2) that the plaintiff had a right to rely on *435 the misstatement (in the case of fraud) or that such reliance was justifiable under the circumstances (in the case of negligent misrepresentation). Almost inevitably, establishing these elements requires an individualized inquiry.
As we held in Broussard, “the reliance element of ... fraud and negligent misrepresentation claims [is] not readily susceptible to class-wide proof;” rather, “proof of reasonable reliance ... depend[s] upon a fact-intensive inquiry into what information each [plaintiff] actually had.” Broussard, 155 F.3d at 341. Nor are we alone in so holding. See, e.g., Andrews v. AT & T, 95 F.3d 1014, 1025 (11th Cir.1996) (decerti-fying class in part because' “the plaintiffs would ... have to show, on an individual basis, that they relied on the misrepresentations, suffered injury as a result, and incurred a demonstrable amount of damages”); Castano v. Am. Tobacco Co., 84 F.3d 734, 745 (5th Cir.1996) (concluding that “a fraud class action cannot be certified when individual reliance will be an issue”).
The district court nevertheless found that the required proof of reliance in this case would not require an individual “fact-intensive inquiry” sufficient to render class certification improper, but instead found that actual reliance could be “presumed” and the right to rely “assumed.” Those findings are grounded on a misunderstanding of controlling law.
1.
First, the district erred in suggesting that Basic Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), supports a presumption of actual reliance in this ease. See J.A. 1268 and n.27 (“[A] common sense approach presuming reliance exists may be acceptable in this circumstance.”) (citing Basic, 485 U.S. at 246-47, 108 S.Ct. 978). In fact, neither Basic, nor any other precedent, supports a presumption of actual reliance in the case at hand.
Basic involved a shareholders’ suit alleging that a company made material misrepresentations about the status of merger talks. In opposing class certification, the company argued that common issues did not predominate because each shareholder had to establish reliance on the misrepresentation in making decisions to buy or sell the stock. The Supreme Court rejected this argument, reasoning that “[b]ecause most publicly available information is reflected in market price, an investor’s reliance on any material misrepresentations ... may be presumed for purposes of a Rule 10b-5 action.” Basic, 485 U.S. at 247, 108 S.Ct. 978. This presumption was based on the “fraud-on-the-market theory,” i.e., even if an individual investor was not aware of the misrepresentation (and therefore did not directly “rely” on it in the traditional sense), the market price of the stock reflected the misrepresentation, thereby providing “the requisite causal connection between a defendant’s misrepresentation and a plaintiff’s injury” that is the touchstone of reliance. Id. at 243, 108 S.Ct. 978. In Basic, therefore, the capacity of the capital markets to rapidly assimilate public information into stock prices provided the basis for presuming a causal connection between a material misrepresentation and a plaintiffs injury, even when that plaintiff may have been completely unaware of the misrepresentation (let alone “relied” on it in the traditional sense). By contrast, Plaintiffs’ allegations of fraud and misrepresentation offer no substitute for actual reliance to establish such a causal connection. Rather, if an individual plaintiff in this case were unaware of the alleged misrepresentations, but nevertheless purchased the Plan, we see no basis for presuming that the mis *436 representations nevertheless were a proximate cause of her damages. Absent this presumption, individualized inquiry will be required to show that Plaintiffs actually relied on the Agents’ alleged misrepresentations.
2.
The district court also erred in concluding that individualized inquiry would not be necessary to establish the second element of reliance — that Plaintiffs had a right to rely on the Agents’ alleged misrepresentations or that reliance was justified.
The court held that “[u]nder South Carolina law, such reliance on an insurance agent is reasonable,” J.A. 1268 (citing Trotter v. State Farm Mut. Auto. Ins. Co., 297 S.C. 465, 377 S.E.2d 343, 351 (Ct.App.1988), for the proposition that it is “reasonable for [an] insured to assume the truthfulness of’ an insurance agent’s representations). But in fact, South Carolina law only holds that “it is reasonable for the insured to assume the truthfulness of’ his agent’s representations under limited circumstances not present in this case — and, indeed, not present in Trotter either. See Trotter, 377 S.E.2d at 350-51 (concluding that reliance was not reasonable and distinguishing circumstances from those of Giles v. Lanford & Gibson, Inc., 285 S.C. 285, 328 S.E.2d 916 (Ct.App.1985)).
Thus, in Giles, South Carolina’s intermediate appellate court held that when the unintelligible language of a written agreement would prevent an insured from discovering the falsity of an insurance agent’s representation, it is reasonable for the insured to assume the truthfulness of the insurance agent’s oral misrepresentation of the written agreement. Giles, 328 S.E.2d at 918-19. Because the case at hand, like Trotter, does not involve allegations of oral misrepresentations, or a written agreement so unintelligible that Plaintiffs could not have reasonably discovered any falsity of representation by reading the policy, the Giles “assumption” has no bearing here. As even the Giles court noted, it has long been the law in South Carolina that:
[w]hether or not reliance upon a representation in a particular case is justifiable or excusable, what constitutes reasonable prudence and diligence with respect to such reliance, and what conduct constitutes a reckless or conscious failure to exercise such prudence, will depend upon the various circumstances involved, such as the form and materialty (sic) of the representations, the respective intelligence, experience, age, and mental and physical condition of the parties, and the relation and respective knowledge and means of knowledge of the parties.
Id. at 918 (quoting Thomas v. Am. Workmen, 197 S.C. 178, 14 S.E.2d 886, 888 (1941) (emphasis added)). Thus, the district court misconstrued South Carolina law when it concluded that Plaintiffs’ right to rely on the Agents’ misrepresentations could be assumed without inquiring into the individual circumstances of each plaintiffs case.
Therefore, we conclude that the district court abused its discretion in finding that justifiable reliance could be assumed or presumed in this case. Absent this assumption or presumption, individual issues clearly predominate. As the Supreme Court recognized in Basic, 485 U.S. at 242, 108 S.Ct. 978, “[Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented [plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the *437 common ones.” Accord Broussard, 155 F.3d at 341.[12]
B.
A second reason why common issues do not predominate in Plaintiffs’ claims against the Agents relates to the duty owed to Plaintiffs by the Agents. Plaintiffs’ contentions of negligent undertaking are based on the Agents’ alleged failure in their “duty to properly inform Plaintiffs and other members of the class about the value, quality, and extent of coverage” provided under the Plan. These contentions also require individualized inquiry.
Generally, under South Carolina law, an insurance agent does not have any duty to advise an insured. See Pitts v. Jackson Nat’l Life Insur. Co., 352 S.C. 319, 574 S.E.2d 502, 510 (S.C.Ct.App.2002) (citing Trotter, 377 S.E.2d at 347). A duty may be imposed, however, “if the agent, nevertheless, undertakes to advise the insured.” Carolina Prod. Maint., Inc. v. United States Fid. & Guar. Co., 310 S.C. 32, 425 S.E.2d 39, 43 (1992) (citing Trotter, 377 S.E.2d at 347). Absent an express undertaking to assume such a duty (and Plaintiffs do not contend that the Agents expressly undertook such a duty here), a duty can be impliedly created. Id. But in determining if an implied duty has been created, courts must consider several factors, including whether: “(1) the agent received consideration beyond a mere payment of the premium, ... (2) the insured made a clear request for advice, ... or (3) there is a course of dealing over an extended period of time which would put an objectively reasonable insurance agent on notice that his advice is being sought and relied on.” Id. (citing Trotter, 377 S.E.2d at 347). Obviously, consideration of these factors — and thus proof of any implied duty — requires an inquiry into the facts of each particular case.
"When certifying subclasses against the Agents, however, the district court ignored these legal principles. On appeal, Plaintiffs cannot. They must, and do, acknowledge them. They maintain, however, that the principles articulated in Trotter and Carolina Production apply only to insurance agents and that the defendant Agents are insurance brokers, who, Plaintiffs assert, “do have a special duty to their clients.”
But Plaintiffs’ argument — that the Agents were really “insurance brokers”— rests on a flawed premise. Under South Carolina law, an “insurance broker” represents people seeking insurance, while an “insurance agent” represents the insurance company. See S.C.Code §§ 38-1-20, 38-43-10 (2002); see also Allstate Ins. Co. v. Smoak, 256 S.C. 382, 182 S.E.2d 749, 753-54 (1971) (distinguishing between insurance brokers and agents on basis of whether employed by person seeking insurance or by insurance company to solicit and write insurance). In this case, the district court specifically found that the Agents are licensed “insurance agents” who marketed and sold the Plan. Plaintiffs point to nothing in the record to support their contention that the Agents were actually “insurance brokers.”[13] Accordingly, we can hardly ignore Trotter and Carolina *438 Production and the individualized proof inquiries those cases require.
C.
In addition to the individualized determinations inherent in Plaintiffs’ claims against the Agents, the affirmative defenses of comparative negligence, assumption of risk, and setoff asserted by the Agents pose significant obstacles to class certification. Similarly, even if actual, justifiable reliance could be presumed, the Agents would still be permitted to introduce evidence to rebut this presumption with respect to individual plaintiffs. See Banca Cremi v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1036 (4th Cir.1997) (citing Carras v. Burns, 516 F.2d 251, 257 (4th Cir.1975), for proposition that the inference of reliance is rebuttable). The district court again ignored the problems for class certification posed by these defenses.
On appeal, Plaintiffs maintain that “numerous courts” have rejected the notion that the assertion of affirmative defenses renders class certification inappropriate. However, they cite only In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 138 (2d Cir.2001), in which the Second Circuit merely stated that the presence of affirmative defenses does not “automatically” render class certification inappropriate. Rather, like other considerations, affirmative defenses must be factored into the calculus of whether common issues predominate. Id. at 138.
Moreover, regardless of other courts’ interpretations of Rule 23, we have flatly held that “when the defendants’ affirmative defenses ... may depend on facts peculiar to each plaintiffs case, class certification is erroneous.” Broussard, 155 F.3d at 342 (citation and internal quotation marks omitted). Although it is difficult to determine with any precision, it appears that here the Agents’ affirmative defenses are not without merit and would require individualized inquiry in at least some cases. Therefore, they may, indeed, “depend on facts peculiar to each plaintiffs case.” Accordingly, “class certification [wa]s erroneous.” Id. at 342.
D.
Given the need for individual inquiry into these issues, we must hold that the class actions certified by the district court against the Agents do not meet the commonality and predominance requirements of Rule 23. Thus, the district court abused its discretion in conditionally certifying these class actions.
V.
Finally, we turn to a contention never raised by any of the parties: our dissenting colleague’s “threshold” argument, post at 450, that even if common issues do predominate in Plaintiffs’ cause of action, as a whole, against TPCM — i.e., “that TPCM violated its duties, both contractual and at law, as third party administrator of the Plan and such conduct was a cause of the Fidelity Plan’s failure,” and that “failure directly injured Plaintiffs and the absent class members,” J.A. 1249 — the district court erred in confining its predominance inquiry to that cause of action. The dissent steadfastly contends that the district court should instead have evaluated whether common issues predominated in the entire “action taken as a whole.” See post at 446 (emphasis in original); see also id. at 447, 452 (“the case as a whole”); 449, 450, 451, 452 (“the action as a whole”); and 452 (“the entire action”). According to the dissent, a district court must first “determine that” an entire law suit “as [a] whole” (i.e. not only the cause of action against TPCM but also the very different causes of action asserted against the *439 Agents) satisfies the predominance and superiority requirements imposed by 23(b)(3) and only if the entire lawsuit does satisfy these requirements may a court “manage[ ] through orders authorized by 23(c).” See id. at 453. The dissent’s argument finds no support in the law — not in Rule 23 itself nor in any case or treatise. Indeed, in addition to ignoring the plain language of Rule 23, and rendering a subsection of the rule superfluous, the dissent’s argument is contrary to the Supreme Court’s interpretation of Rule 23, our own precedent and that of every other court (including eight federal appellate courts), and every scholarly treatise that has addressed the issue.
First, the dissent’s rigidly sequential approach ignores the plain language of the rule. Rule 23(c)(4) provides that:
[w]hen appropriate (A) an action may be brought or 'maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly.
Fed.R.Civ.P. 23(c)(4) (emphasis added). Thus, Rule 23 specifically dictates that “[w]hen appropriate” a class action may be “maintained” as to “particular issues” and, after that is done, “the provisions of this rule,” such as the predominance requirement of (b)(3), “shall then ... be construed and applied.” Id. (emphasis added). The dissent’s approach — that a court first determine “that the action as [a] whole satis-fíes the predominance and superiority requirements imposed by 23(b)(3)” and only then employ subsection 23(c)(4), post at 453, simply ignores Rule 23(c)(4)’s express command.[14] Of course, courts have no discretion to ignore the plain language of a statute or federal rule. See, e.g., United States Nat’l Bank of Oregon v. Indep. Ins. Agents of Am., 508 U.S. 439, 454, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (noting that “plain meaning must be enforced, of course”).
Moreover, the dissent’s approach would render subsection (c)(4) of Rule 23 superfluous. The dissent would require a court considering the manageability of a class action — a requirement for predominance under Rule 23(b)(3)(D) — to pretend that subsection (c)(4) — a provision specifically included to make a class action more manageable — does not exist until after the manageability determination is made. Thus, under the dissent’s reading of Rule 23, a court could only use subsection (c)(4) to manage cases that the court had already determined would be manageable without consideration of subsection (c)(4). This reading leaves subsection (c)(4)(A) without any practical application, thereby rendering it superfluous. See In re Tetracycline Cases, 107 F.R.D. 719, 726-27 (W-D.Mo.1985) (“If the requirement under Rule 23(c)(4)(A) was that ... one or more issues ‘predominate’ in the usual Rule 23(b) sense, when compared with all the issues in the case, there would obviously be no need or place for Rule 23(c)(4)(A).” (emphasis in original)). Such an interpre *440 tation of Rule 23 contravenes the well-established prohibition against reading a provision in a manner that would make any “clause, sentence, or word ... superfluous, void, or insignificant,” TRW Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) (internal quotation marks and citations omitted).
In addition to ignoring Rule 23’s plain language and rendering a part of it superfluous, the dissent’s rigid, sequential reading of the rule conflicts with controlling precedent. The Supreme Court has refused to read Rule 23 in the strictly sequential fashion advocated by the dissent. To the contrary, in its most recent discussion of Rule 23(c)(4), Ortiz v. Fibreboard Corp., 527 U.S. 815, 856, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), the Court suggested that a district judge could initially act pursuant to subsection (c)(4) to create subclasses so as to satisfy the previously listed requirements of subsection (a)(4). Indeed, the Ortiz Court pointed out that this result “is obvious after Amchem,” the case on which the dissent so heavily relies for its theory. See id. (noting that “it is obvious after Amchem that a class divided between holders of present and future claims ... requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel.” (citing Amchem, 521 U.S. at 627, 117 S.Ct. 2231 (emphasis added))). Although the dissent claims otherwise, if its interpretation of Rule 23 is followed, Ortiz notwithstanding, a court could never use subsection (c)(4) to divide plaintiffs into homogeneous subclasses “to eliminate conflicting interests of counsel,” id., because plaintiffs’ “entire action” “as a whole” would not satisfy the adequacy of representation requirement of Rule 23(a)(4), and would therefore never “pass through the gate[ ]” of Rule 23(a). Post at 450; see also id. at 449 (noting that an action must first satisfy “the requirements of Rule 23(a)” before a court can employ (e)(4)).[15] Despite its lengthy attempt to analogize Amchem to the case at hand, in an effort to find some support for its gatekeeper theory, see post at 449-451, the dissent fails to take into account the Supreme Court’s own characterization and application of Amchem in Ortiz.
Moreover, the dissent acknowledges, but then disregards the import of the conclusion of the Amchem Court itself that “settlement is relevant to a class certification,” and that Rule 23(e) affects a court’s evaluation of predominance. 521 U.S. at 614, 117 S.Ct. 2231 (emphasis added). The Supreme Court explained in Amchem that when dealing with a settlement-only class pursuant to Rule 23(e), “a district court need not inquire whether the case, if tried, would present intractable management problems,” which would ordinarily be necessary to satisfy Rule 23(b)(3)’s predominance requirement. Id. at 620, 117 S.Ct. 2231 (emphasis added) (citing Fed. R.Civ.P. 23(b)(3)(D)). The dissent thus ignores the lesson of Amchem most relevant to the dissent’s “threshold” contention in the case at hand, ie., the Supreme Court’s recognition that the subsections of Rule 23 are interactive, and not to be followed, as the dissent suggests, in a strictly sequential fashion. In sum, in its two most recent class action decisions, Ortiz and Am-chem, the Supreme Court eschewed the dissent’s suggested approach of reading each of Rule 23’s provisions sequentially.
*441 Additionally, precedent from our own court flatly rejects the dissent’s sequential interpretation of Rule 23. In In re A.H. Robins, 880 F.2d at 740, we counseled that “courts should take full advantage of the provision in subsection (c)(4) permitting class treatment of separate issues in the case.” We expressly recognized that “if [an] action includes multiple claims, one or more of which might qualify as a certifiable class claim, the court may separate such claims from other claims in the action and certify them under the provisions of subsection (c)(4),” provided that “each subclass must independently meet all the requirements of (a) and at least one of the categories specified in (b).” Id. at 728 (emphasis added). Thus, contrary to the dissent’s protests in this case, we do not espouse a new rule. Rather we follow the rule articulated in A.H. Robins — that subsection 23(c)(4) should be used to separate “one or more” claims that are appropriate for class treatment, provided that within that claim or claims (rather than within the entire lawsuit as a whole), the predominance and all other necessary requirements of subsections (a) and (b) of Rule 23 are met.
Nor are we alone. Not a single court has followed the dissent’s approach. Several courts and a number of distinguished commentators have explicitly endorsed a broad issue specific predominance analysis of Rule 23. See, e.g., Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir.1996) (“Even if common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues.” (citations omitted)); Simon v. Philip Morris, Inc., 200 F.R.D. 21, 28-31 (E.D.N.Y.2001) (Weinstein, J.) (“The framers of Rule 23(c)(4)(A) considered class actions brought under Rule 23(b)(3) ... particularly well suited for certification of fewer than all issues. Their conclusion follows from the fact that Rule 23(c)(4)(A) assists in satisfying Rule 23(b)(3)’s additional class certification requirements of predominance and superiority.” (citations omitted)); Emig v. Am. Tobacco Co., 184 F.R.D. 379, 395 (D.Kan.1998) (explaining that Rule 23(c)(4)(A) permits “adjudication of any issues common to the class even though the entire litigation may not satisfy the requirements of Rule 23”); 6 Newberg on Class Actions § 18:7 (“Even cases which might not satisfy the predominance test when the case is viewed as a whole may sometimes be certified as a class limited to selected issues that are common, under the authority of Rule 23(c)(4).”); 7B Wright & Miller, Federal Practice and Procedure § 1790 (“Subdivision (c)(4) is particularly helpful in enabling courts to restructure complex cases to meet the other requirements for maintaining a class action.... The theory of Rule 23(c)(4)(A) is that the advantages and economies of adjudicating issues that are common to the entire class on a representative basis should be secured even though other issues in the case may have to be litigated separately by each class member.”).
All other courts have explicitly or implicitly endorsed an interpretation of (c)(4) that considers whether Rule 23’s predominance requirement is met by examining each cause of action independently of one another, not the entire lawsuit, as the dissent would. See, e.g., Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32, 38-43 (1st Cir.2003) (reversing decerti-fication of two out of three decertified claims and affirming decertification with respect to third claim); Piazza v. EBSCO Industries, Inc., 273 F.3d 1341, 1349, 1351-53 (11th Cir.2001) (finding “no basis *442 for concluding that the district court abused its discretion by certifying a class against the EBSCO Defendants on” claim for breach of fiduciary duty for lost profits but finding abuse of discretion for certification of stock sale and under-valuation claims against EBSCO and reversing class certification with respect to claims against another defendant, Price Waterhouse Cooper); Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 154 (2d Cir.2001) (evaluating plaintiffs’ disparate impact claim separately from pattern-or-practice disparate treatment claim); Becherer v. Merrill Lynch, 193 F.3d 415, 430 (6th Cir.1999) (en banc) (Moore, J., concurring in the judgment) (noting that district court “properly certified a class with respect to the contract claims” against one defendant, without ruling on fraud and other claims against multiple defendants); id. at 428 (majority opinion) (noting without disapproval that “the district court reached the class certification question with respect to the contract issues, but not the remaining claims”); Allison v. Citgo Petroleum Corp., 151 F.3d 402, 421-22 (5th Cir.1998) (conducting an independent predominance inquiry for each cause of action); Cannon v. Cherry Hill Toyota, Inc., 184 F.R.D. 540, 544 (D.N.J.1999) (“This court ... has previously rejected the notion that class certification under Rule 23 is ‘an all-or-nothing proposition’ requiring class certification of all causes of action asserted in a single pleading.” (citations omitted)); Stephenson v. Bell Atl. Corp., 177 F.R.D. 279, 289 & n. 4, 295 (D.N.J.1997) (granting class certification for antitrust claims, denying certification for claims of statutory and common law fraud, breach of duty of good faith and fair dealing, unjust enrichment, and money had and received, and noting that “[djifferential treatment of claims is permitted by Rule 23(c)(4)” and that no cases suggest “that class certification of all asserted causes of action is an all-or-nothing proposition”); Hudson v. Capital Mgmt. Int’l, Inc., 565 F.Supp. 615, 630-31 (N.D.Cal.1983) (granting class certification for statutory claims of fraud and negligent misrepresentation and denying certification for common law claims despite recognizing that “[individual questions of law and fact would vastly overshadow any common questions if the court were to certify classes based on the common law claims”); Lewis v. Capital Mortgage Invs., 78 F.R.D. 295, 307 (D.Md.1977) (granting class certification for securities law claims but excluding common law fraud claim from class action certification); Hernandez v. Motor Vessel Skyward, 61 F.R.D. 558, 561 (S.D.Fl.1973) (granting class certification for negligent exposure cause of action but not breach of contract, breach of implied warranty, or inadequate medical treatment causes of action); see also Hannah Stott-Bumsted, Note, Severance Packages: Judicial Use of Federal Rule of Civil Procedure 23(c)(4)(A), 91 Geo. L.J. 219, 231 (2002) (observing that “there is little dispute” that certification of a single claim in a suit where plaintiffs assert multiple claims “is an acceptable use of the district court’s discretion under Rule 23(c)(4)(A).”)
Indeed, the Third Circuit has twice reversed district courts for taking the dissent’s approach and failing to consider class certification of individual claims. See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 453(3d Cir.1977) (“Even assuming that the court were correct in its conclusion that the lease claim is not appropriate for class determination, it nevertheless should have considered certification of the trade-mark claim under Rule 23(c)(4)(A).”); Geraghty v. United States Parole Comm’n, 579 F.2d 238, 252-53 (3d Cir.1978) (rejecting district court’s conclusion “that a class action is inappropriate” because “not all of the grounds of action alleged in the complaint *443 are applicable to the [proposed] class” because that conclusion “does not properly acknowledge the powers and duties of the trial court under section (c)(4) of Rule 28”), vacated on other grounds, 445 U.S. 888, 402-03, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980).
Again, no court has adopted the dissent’s interpretation of Rule 23; no court has required a lawsuit-specific predominance analysis. Thus, the dissent’s attacks on our approach are as baffling as they are ill-founded. The dissent’s contention that our approach “bypasse[s]” and “subvert[s]” Rule 23(b)(3)’s predominance requirement, and “strips Rule 23(b)(3) of its meaning,” post at 448, 450 and 451, is simply false. We have scrupulously analyzed whether Plaintiffs’ claims against TPCM and the Agents satisfy the predominance requirement. See ante at 425-426, 427-428, 434-438. After doing so, we have concluded that Plaintiffs’ cause of action against TPCM — “that TPCM violated its duties ... as third party administrator of the Plan,” which caused “the Plan’s failure” and so “directly injured Plaintiffs” J.A. 1249 — taken as a whole, satisfies all of Rule 23’s requirements, including predominance, ante at 425-426, 427-430.[16] That the dissent reaches a different conclusion as to whether common issues predominate with respect to Plaintiffs’ claim against TPCM does not mean that we “strip[] Rule 23(b)(3) of its meaning;” it just means that the dissent disagrees with our assessment. Indeed, the continuing vitality of Rule 23(b)(3)’s predominance requirement dictated our reversal with respect to Plaintiffs’ claims against the Agents — a decision with which the dissent concurs.
The dissent offers an equally perplexing response to the wealth of authority cited above, including cases from the First, Second, Third, Fourth, Fifth, Sixth, Ninth, and Eleventh Circuits, all of which have rejected the dissent’s contention that a class can be certified only if the common issues in “the entire action” — ie., every cause of action against every defendant— predominate over individual issues in “the entire action.” The dissent does not discuss, let alone distinguish, most of the cases we cite; it simply maintains that they do not exist. See post at 63 (dissent noting it can “identify” no circuit precedent supporting the majority’s holding).[17]
*444 Just as confounding, is the dissent’s contention that the Fifth Circuit has adopted the dissent’s approach and that we, in assertedly refusing to follow the Fifth Circuit, create a circuit conflict. See post at 446-447, 452-453 (citing Smith v. Texaco, Inc., 263 F.3d 394 (5th Cir.2001), Allison v. Citgo Petroleum Corp., 151 F.3d 402 (5th Cir.1998), and Castano v. Am. Tobacco Co., 84 F.3d 734 (5th Cir.1996)). In fact, the Fifth Circuit cases do not state, let alone hold, as the dissent would, that “the entire action,” or “the action as a whole” — i.e., all causes of action against all parties — must satisfy Rule 23(b)(3)’s predominance requirement before a court can employ Rule 23(c)(4) to certify a class. Rather, the Fifth Circuit cases merely require that “a cause of action, as a whole, must satisfy rule 23(b)(3)’s predominance requirement” before “rule 23(c)(4) is available.” See Smith, 263 F.3d at 409 (emphasis added); Allison, 151 F.3d at 421-22; Castano, 84 F.3d at 745 n. 21.[18] To be sure, as the Second Circuit has noted,there is a circuit conflict as to whether predominance must be shown with respect to an entire cause of action, or merely with respect to a specific issue, in order to invoke (c)(4). See Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 167 n. 12 (2d Cir.2001) (noting the Fifth Circuit’s “strict application of the (b)(3) predominance inquiry to the entire pattern or practice claim” before a court can invoke (c)(4) and further noting that “an alternative understanding of the interaction of (b)(3) and (c)(4) ... has been advanced elsewhere” including by the Ninth Circuit in Valentino, 97 F.3d at 1234). But we have no need to enter that fray (and similarly the dissent’s ruminations about “pinhole” issue certification have no relevance here) because, as we have demonstrated within, in this case *445 Plaintiffs’ cause of action as a whole against TPCM satisfies the predominance requirements of Rule 28. Thus even if the view adopted by the Fifth Circuit (that predominance must be established within a given cause of action to invoke (c)(4)) rather than that of the Ninth Circuit (that this is not necessarily required) constituted the law of this circuit, our holding here would be in full accordance with the Fifth Circuit view.
In fact, we are aware of no decision by any court that has adopted the dissent’s view that in cases such as the one before us, involving more than one cause of action, a court must evaluate predominance in the context of the “action taken as a whole” or the “case as a whole.” Post at 458 and 459. On the contrary, as discussed above, it is the dissent’s approach that would create a direct conflict with all other courts, and abrogate longstanding precedent and practice in the area of class action law. See ante at 439-448.
Finally, the dissent errs in predicting a “procedural nightmare” on remand. See post at 448. The class action certified by the district court against TPCM involves a single, straightforward cause of action consisting of three questions common to all Plaintiffs — whether “TPCM violated its duties ... as third party administrator of the Plan,” whether “such conduct was a cause of the Fidelity Plan’s failure,” and whether “that failure directly injured Plaintiffs and the absent class members.” J.A. 1249. Neither of the first two questions require any individual inquiry, and the third question may require nothing more than a ministerial determination that can be made simply and quickly. We are confident at this stage that proceeding with this cause of action on a classwide basis will “ ‘achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.’ ” See Amchem, 521 U.S. at 615, 117 S.Ct. 2231 (citation omitted).[19] Moreover, it is important to remember that we are only approving a conditional certification of the case, and that the district court has explicitly stated that it would not hesitate to decertify the class if it became unmanageable. J.A. 1260-61. Thus, in the unlikely event that the case becomes a “procedural morass,” as the dissent predicts, post at 448, we are confident that the district court will fulfill its responsibility to decertify the class.
VI.
In conclusion, we note that circuit precedent provided clear guidance in resolving the issues presented in this case. On one hand, Plaintiffs’ class action against TPCM bears many similarities to the class action we approved in Central Wesleyan, and promises many of the advantages: the plaintiffs advance'a single theory of liabili *446 ty, requiring no individualized inquiry; class certification seems likely to conserve judicial resources and conserve litigation costs by reducing the need to relitigate liability issues in multiple trials; in the absence of class certification it appears that many of Plaintiffs’ claims against TPCM would not be brought; and class certification protects the defendant, TPCM, from inconsistent adjudications and one-way issue preclusion. Moreover, as in Central Wesleyan, the district court carefully assessed all of Rule 23’s requirements for a class action and issued detailed factual findings explaining its decision in conditionally certifying the class. Indeed, to the extent there are significant differences between the class action certified against TPCM and the class action certification approved in Central Wesleyan— such as the need in Central Wesleyan to determine comparative fault, and the application of the laws of different jurisdictions — these differences weigh even more heavily in favor of class certification here. In sum, Central Wesleyan virtually compels the conclusion that the district court did not abuse its discretion in conditionally certifying Plaintiffs’ class against TPCM.
On the other hand, Plaintiffs’ proposed class actions against the Agents have many parallels to the class action we rejected in Broussard: the claims against the Agents require individualized proof of rebanee and individualized proof of a specific undertaking to advise. The Agents’ affirmative defenses would also require further individualized inquiry. Thus, Broussard would seem to require the conclusion that common issues do not predominate, and that class certification is not appropriate. Indeed, the district court recognized Broussard’s force and therefore attempted mightily to distinguish the case. The court could do so, however, only by misconstruing or ignoring controlling legal principles. When a court misapprehends or fails to apply the law with respect to underlying issues, it abuses its discretion. Accordingly, we hold that the district court abused its discretion in granting conditional class certification against the Agents.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS

. Also in 1998, the United States Department of Labor filed suit against the Fidelity Group for actions relating to the Fund in the Eastern District of New York. That court issued an order on January 8, 1999 staying all pending actions against the Fund. Pursuant to this order, the district court in South Carolina issued a stay of the proceedings in the present case. After the New York court clarified that its stay reached only the Fidelity Defendants, the district court in the case at hand lifted the stay with respect to the "non-Fidelity Defendants” — TPCM and the agents. Ultimately, on the advice of a court-appointed fiduciary, the New York court ordered the Plan terminated effective January 31, 1999.

. Originally, fourteen agents appealed the class certification order. While the appeal was pending, eight agents moved to withdraw their appeal because they had reached a settlement with the class. We now grant the eight agents’ motion to withdraw their appeal and remand to the district court for consideration of the settlement proposal pursuant to Federal Rule of Civil Procedure 23(e) and in light of this opinion. See Fed.R.Civ.P. 23(e); see also Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (articulating different standard for settlement-only class certification). Our holding with respect to the district court's certification of subclasses against individual agents, therefore, pertains only to the six agents whose appeals remain before us.

. Thus, in paying heed to "the conditional’ aspect of [the] certification” here, we do not, as the dissent asserts, “default [ ] our responsibility” or "employ[] a backward burden.” See post at 465 n. 8. Rather, we simply follow Central Wesleyan's well-established directive. The dissent not only ignores that directive, it also contends (without explanation) that other "portions” of Central Wesleyan may have been "superseded” by Amchem. See post at 468. We disagree. In fact, in Central Wesleyan, the court carefully recognized and sought to avoid the problems created by the lower court in Amchem. See Central Wesleyan, 6 F.3d at 182, 189 (noting that "the Third Circuit's ongoing experiment in class certification [in the Amchem litigation] has not been an unqualified success”).

. Thus, TPCM benefits more from class certification than the Plaintiffs in some ways, since the effect of class certification on collateral estoppel redounds to the benefit of defendants, not plaintiffs, whereas the beneficial economies of class certification redound to all parties, as well as to the courts. One suspects, therefore, that TPCM resists certification in an attempt to keep Plaintiffs with relatively small claims out of court altogether- — precisely the problem the class action mechanism was designed to address. See Amchem, 521 U.S. at 617, 117 S.Ct. 2231.

. TPCM couches this argument as one involving “due process” but cites no authority indicating that this concept applies in this con *428 text. In any event, TPCM contends that "due process” requires the district court to conduct an individual inquiry to determine the benefit amount to which each class member was rightfully entitled and if a member was not deprived of any benefit as a result of the Plan’s collapse, then TPCM could not be said to be the proximate cause of that member’s injury. Substantively, this argument is identical to the contention, discussed in text, that, TPCM must be allowed the opportunity to show that an individual class member did not suffer any damages. As explained above, affording TPCM this opportunity does not destroy Plaintiffs' ability to satisfy the requirements of Rule 23.

. TPCM reasserts its individualized damages argument when contending that the certified class lacks numerosity and superiority. The argument is no more persuasive in those contexts. Indeed, TPCM's repeated attempts to reprise the same argument testify to the fundamental weakness of its contention that the conditional class certification order constituted an abuse of discretion.

. The dissent insists that an additional conflict exists between the employer class members and the employee class members based on the different remedies sought by each group. See post at 466-467. However, "[p]o-tential conflicts relating to relief issues which would arise only if the plaintiffs succeed on common claims of liability on behalf of the class will not bar a finding of adequacy.” Hanrahan v. Britt, 174 F.R.D. 356, 364 (E.D.Pa.1997) (internal quotation marks and citation omitted); see Bogosian v. Gulf Oil Corp., 561 F.2d 434, 449 (3d Cir.1977) (finding that representation was adequate even though current gas station lessees and former lessees would ultimately seek different remedies); see generally 1 Newberg on Class Actions § 3:25, at 422-23 & n.4 (collecting cases). Therefore, any conflict in the forms of recovery sought by these groups of plaintiffs does not warrant decertification.

. We find somewhat disingenuous the dissent's suggestion that we have "done a disservice to an identifiable group of plaintiffs,” by exposing
them to arguments that their claims are now untimely. Post at 463 n.7. First, Plaintiffs with direct claims against TPCM would be equally subject to these arguments under the dissent's proposed resolution of the case. Second, while the dissent is, of course, correct that TPCM could raise a statute of limitations defense against Plaintiffs asserting direct claims, it is far from clear that TPCM would be successful. Cf. Crown, Cork & Seal Co., Inc. v. Parker, 462 U.S. 345, 353-54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) (holding that " 'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action,' ” and that "[o]nce the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied” (quoting Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974))).

. The dissent's effort to analogize this case to Lierihart, and to assert that we ignore "the complex question of comparative fault” arises from the same misperception regarding separate Plaintiff classes that animates the dissent’s argument with respect to conflicts among Plaintiff classes. See post at 464, 467. Because there is only a single Plaintiff class with a single cause of action — that TPCM's mismanagement contributed to the demise of the Plan — issues of comparative fault will require no individual inquiry apart from that required to calculate damages. The extent to which TPCM’s conduct contributed to the collapse of the Plan, and the comparative fault of intervening parties, such as Fidelity, will be the same for every Plaintiff. In Lienhart, 255 F.3d at 149, by contrast, the intervening actors and the intervening acts were different for every plaintiff, thereby creating the possibility that the defendant’s degree of liability would be different with respect to every plaintiff.

. TPCM makes two ancillary arguments that we need address only briefly. First, it asserts that the district court improperly relied on affidavits of principals of the Fidelity Defendants, whom TPCM could not examine because it was not a defendant in this case when the affiants were deposed, and the New York court later stayed all proceedings against the Fidelity Defendants. This argument rests on a faulty premise, i.e., that TPCM was unable to depose the affiants. In fact, we do not know whether TPCM could have deposed the affiants because it never sought to do so. Second, TPCM asserts that the district court’s ruling rested on erroneous facts. Even if it could show that these factual findings were "clearly erroneous,” it has utterly failed to demonstrate that any of these errors affected its substantial rights. See Fed.R.Civ.P. 61.

. In addition, we note our reservations about the district court’s determination as to compliance with the numerosity requirement, see J.A. 1265 (noting that some Agent subclasses have as few as eight class members), and the superiority requirement, compare J.A. 1271 (holding the South Carolina Department of Insurance's current administrative proceeding to revoke the Agents’ licenses has "no bearing ... on this proceeding”) with 5 Moore's Federal Practice § 23.49[3] (1997) (noting that "if a governmental unit has brought suit on the same issue, a court may decide that the proposed class action is unnecessary and an inferior method of adjudication”). We need not address these issues, however, because all of Rule 23's requirements must be met. Therefore, our conclusion that the class fails to meet the commonality and predominance requirements is dispositive in this case.

. Of course, proof of individual reliance need not overwhelm the common issues in every case. However, considering the centrality of the Plaintiffs’ allegations involving reliance, and the other issues requiring individual inquiry, common issues clearly do not predominate in this case.

. Plaintiffs’ broker versus agent distinction is surprising given their heavy reliance on Trotter, a case involving an insurance agent, for the argument discussed in Part IV.A.2.

. The Advisory Committee on Civil Rules has recognized subsection (c)(4)’s force despite its placement after (b)(3). Thus, in 1995 the Advisoiy Committee considered amending (c)(4) to read, "an action may be certified as a class action with respect to particular claims, defenses, or issues ...” because "the placement in subdivision (c)(4) of the provision permitting class actions for particular issues has tended to obscure the potential benefit of resolving certain claims and defenses on a class basis while leaving other controversies for resolution in separate actions.” See Edward H. Cooper, Class Actions and the Rule-making Process: Rule 23: Challenges to the Rulemaking Process, 71 N.Y.U. L.Rev. 13, 56, 58 (1996) (quoting Proposed Amendments to Rules of Civil Procedure, Class Actions (Feb. 1995 Draft)).

. Of course, Ortiz involves subclasses under Rule 23(c)(4)(B), while the case at hand involves certification of particular issues under (c)(4)(A), but nothing in Rule 23 suggests that (c)(4)(A) does not interact with the other subsections of Rule 23 in the same fashion as (c)(4)(B).

. Thus, contrary to the dissent’s contention, post at 451, there is no reason to “wonder exactly what” the common issues in the certified cause of action against TPCM "predominate over;” they predominate over the individual issues involved in that cause of action.

. Pointing to the various theories of liability alleged in Plaintiffs’ complaint against twenty-three agents and TPCM, the dissent surprisingly asserts that each of these theories constitutes a cause of action and that the certified claim against TPCM is simply a "common question.” See post at 452. Even if this were so, it is unclear how this contention aids the dissent — for the predominance inquiry would still be conducted within the confines of these "causes of action” not the lawsuit as whole, as the dissent would. See, e.g., Allison, 151 F.3d at 421-22. In fact, the dissent’s contention is a red herring. A cause of action is "defined by its factual contours” and is " ‘coterminous with the transaction regardless of the number of substantive theories ... that may be available to the plaintiff.’ ” CoreStates Bank, N.A. v. Huls America, Inc., 176 F.3d 187, 194, 200 (3d Cir.1999) (quoting Restatement (Second) of Judgments § 24 cmt. a). Thus "claims are part of the same cause of action when they arise out of the same transaction ... or the same core of operative facts.” Grausz v. Englander, 321 F.3d 467, 473 (4th Cir.2003) (internal quotation marks omitted). Certainly, in some cases, each theory of liability arises from a different set of operative facts and so constitutes part of a different cause of action. But here, although Plaintiffs assert several theories of liability against TPCM, all of these theories arise from a single set of "operative facts” and so are part of a single cause of action — that TPCM *444 mismanaged administration of the Plan resulting in the Plan’s failure to timely pay out benefits. Moreover, Plaintiffs assert different causes of action, arising from a very different set of "operative facts,” against the Agents— that the Agents misrepresented the Plan’s features leading the Plaintiffs to purchase a woefully deficient Plan. Notably, neither TPCM nor any other defendant challenges the district court’s clearly proper treatment of Plaintiffs' claim against TPCM as a single cause of action separate and independent from their claims against the agents.

. The dissent fundamentally errs in suggesting that we engage in some sort of "words-mithery” in noting this important distinction between the Fifth Circuit’s view and the dissent's approach. See post at 453. In fact, the Fifth Circuit itself has made plain that it means exactly what it has said — a court is to determine that predominance is satisfied when assessing each "cause of action, as a whole,” not the entire lawsuit, as a whole, as the dissent posits. For example, in Allison, 151 F.3d at 407, 409, African-American plaintiffs charged employment discrimination and sought class certification of two causes of action: (1) a claim of systemic disparate treatment by their employer resulting in a pattern or practice of intentional discrimination and (2) a claim of disparate impact arising from a facially neutral employment policy. The Fifth Circuit analyzed each of these claims separately in determining whether (b)(3)’s predominance requirement had been met. Id. at 420-25. In looking at the first cause of action — the disparate treatment/pattern or practice claim — the court held that the "first stage of the pattern or practice claim” could not be divorced from its "second stage” for the predominance analysis. Id. at 421-22. Instead, the court conducted the predominance inquiry by looking at the pattern or practice claim as a whole, and found that common issues did not predominate with respect to that cause of action. Id. Although the different parts of the disparate treatment/pattern or practice cause of action could not be "severed,” the court conducted a completely independent predominance analysis for the second cause of action — the disparate impact claim — to assess, as it said, "the possibility of certifying a class action only on the disparate impact claim." Id. at 422 (emphasis added). This is precisely the approach we have followed; it is the majority, not the dissent, that the Fifth Circuit precedent supports.

. While the dissent bemoans the need for 1,400 separate individual full trials on the non-certified claims, its approach would, in fact, add claims — all of the claims against TPCM — to what it describes as a "minefield for legal error.” Post at 465. Denying class certification against TPCM would require Plaintiffs to prove the same elements of the certified cause of action against TPCM in 1,400 individual trials, with the possibility of contradictory findings and one-way issue preclusion. In contrast, by holding that the district court did not abuse its discretion in conditionally certifying the one cause of action against TPCM, we have faithfully adhered to the text and purpose of Rule 23 and chosen a course that will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated.” See Fed.R.Civ.P. 23 advisory committee’s note (1966 Amendment, subdivision (b)(3)). In doing so, we believe we have removed from the dissent’s "minefield” those mines that could properly be removed.